**UNITED STATES of America,**

v.

**Edwin P. WILSON, Defendant.**

**No. S 83 Cr. 69.**

United States District Court,
S.D. New York.

Oct. 4, 1983.

Released for Publication May 15, 1984.

**1012**

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for United States of America; Eugene Neal Kaplan, Kenneth I. Schacter, Theodore S. Greenberg, Asst. U.S. Attys., of counsel.

Michael G. Dowd, Kew Gardens, N.Y., for defendant; Barry Scheck, David Lewis, William Mogulescu, of counsel.

## OPINION *

EDWARD WEINFELD, District Judge.

Edwin P. Wilson is under indictment on eighteen counts arising from Wilson's alleged plots to assassinate witnesses, potential witnesses, Assistant United States Attorneys, and others involved in prosecutions pending or concluded in United States District Courts located in Texas, Virginia, and Washington, D.C., as well as in the prosecution pending in this Court.[1] Before the Court is a motion by the United States for a ruling, in advance of trial, that various matter the defendant intends to disclose upon the trial is inadmissible as not relevant evidence.

The Court's disposition of this motion is required by the Classified Information Procedures Act ("CIPA" or "Act").[2] Pursuant to the Act,[3] defendant has made a submission briefly describing classified information he intends to disclose upon the trial. By petition of the Attorney General, the United States moved for, and this Court held, an in camera hearing for the purpose of making "all determinations concerning the use, relevance, or admissibility of classified information that would otherwise be made during the trial ...."[4] Based on this hearing, consideration of the papers

---

* This opinion, which was filed under seal on October 4, 1983, at the request of the United States because of references to classified and otherwise sensitive material within the opinion, has been released for publication upon the consent of the parties. The sensitive matter has been deleted from the opinion; where deletions have been made the Court so indicates by specially marked brackets, e.g., "[* *]." The Court's original opinion shall remain under seal.

1. Also among those allegedly targeted by Wilson is Barbara Wilson, the defendant's former wife.

2. The full provisions of CIPA are set forth at 18 U.S.C.A. app. at 408 (West Supp.1983). *See also* Act of Oct. 15, 1980, Pub.L. No. 96–456, 94 Stat. 2025.

3. CIPA § 5(a).

4. CIPA § 6(a).

submitted by the parties, and counsel's arguments in support of their respective positions, the Court makes the determination indicated hereafter and the basis therefor.

### I.

■■■ Under CIPA, in making its rulings on admissibility, the Court is to disregard the fact that certain material may be classified. The Act "does not alter the existing standards for determining relevance or admissibility." [5] Both documentary [6] and testimonial [7] evidence containing classified matter may be admitted if in conformity with the Federal Rules of Evidence. If specific classified information is admissible, the Court may consider an alternative—the substitution for such classified information of a statement admitting the relevant facts that the specific classified information would prove, or a summary of the specific classified information, consistent with preserving the accused's right to make a full defense; if no alternative suffices, the Court may dismiss the indictment or take other measures. [8] If information the defendant intends to disclose at trial is found inadmissible, however, that is the end of the matter as far as CIPA is concerned. The defendant is in no worse position than if a proffer of evidence were rejected upon the trial.

### II.

Defendant's CIPA submission, insofar as it may be described without disclosing specific classified information, encompasses twenty-seven items. [9] Ten of the items describe specific projects Wilson allegedly worked on while employed or associated with the United States intelligence community. [10] One concerns Wilson's general activities in the period 1961–70 while employed at the Central Intelligence Agency ("CIA") and before his employment with Naval Intelligence during the period 1971–76. [11] Fourteen items relate to the activities of Rafael Quintero, a witness in other prosecutions against Wilson and an alleged target in the plot for which Wilson is now on trial. [12] A few of these last items involve Wilson's relationship to Quintero. [13] At least two also involve one [* John Doe *], and Wilson's and Quintero's alleged connection to him. [14] One relates to Barbara Wilson, the defendant's former wife, who, like Quintero, is alleged to have been a target of Wilson's assassination efforts. [15] One item concerns Jerome Brower, a witness for the government in Wilson's trial in Texas and another alleged target of Wilson's alleged plot. [16] According to the government, most of the information described in defendant's submission is classified; most of the classified material is designated secret; some is classified top secret; some information is not classified. The status of other matters, according to the government, cannot be resolved without further information. As noted above, however, the admissibility of the matters described in the CIPA submission in no way depends on their classification status.

Defendant offers a number of theories by which the submitted information is admissible upon the trial.

### III.

■■ The underlying premise of defendant's CIPA submission is that the informa-

---

5. 126 Cong.Rec. H9308 (daily ed. Sept. 22, 1980) (statement of Rep. Mazzoli).

6. CIPA § 8(a).

7. *See id.* § 8(c).

8. *Id.* §§ 6(c), (d).

9. The designation of a portion of defendant's submission as an "item" was made by the government in its response papers. To avoid confusion and disclosure of classified matter, the Court will use the government's designations of matter identified in defendant's submissions.

10. *See* items A, C, D, E, F, H, I, J, K, N.

11. *See* item B.

12. *See* items L, N, O, P(1), P(2), Q, R, S, T, U, V, W, X, Y.

13. *See* items L, N, P, R, W, Y.

14. *See* items N, Y.

15. *See* item G.

16. *See* September 26 submission.

tion contained therein is relevant to showing that Wilson "lacked the intent to solicit the assassination of witnesses and prosecutors connected with his pending cases, that he lacked any motive to do so, and that he, in fact, had a strong motive to make sure many of his alleged victims remained alive."

The thrust of Wilson's principal argument is that he believed that prosecutorial efforts mounted against him for his acts abroad were not serious; that the government would reward him for his patriotic work in American intelligence; and that in any event the acts for which he was prosecuted in other courts were authorized by the United States and thus lawful; hence, notwithstanding any conviction in a federal trial court, he would be exonerated upon appeal. Of strong belief that he would soon be a free man, Wilson contends he had no motive to plot the killing of witnesses and officials. In short, Wilson claims that the details of his work for American intelligence, including "the history and nature of the relationship between Edwin Wilson and Rafael Quintero," his "foxhole buddy" of many years, would tend to negate that he had the required intent to commit the crimes charged or a motive to do so.

Relevant evidence is that which tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." [17] However, evidence cannot be considered, for purposes of relevance, in the abstract.[18] In assessing the relevance of Wilson's intelligence activities to the charges here—that he plotted to assassinate witnesses and

prosecutors in trials in other districts and in this district—the following additional facts are also to be considered.

First, the prosecutorial efforts against Wilson were, over an extended period, extremely vigorous. Wilson was wanted for arrest by federal officials as early as 1980,[19] when he was indicted in the District of Columbia while a fugitive in Libya.[20] Indeed, Wilson claimed in this very Court that "he was forcibly brought back to the United States against his consent, without proper authorization and in violation of his constitutional rights." [21]

Second, after Wilson was arrested and brought to the United States, there was no diminution in the government's prosecutorial efforts. He was indicted in three districts. The government's concern that he be present and face trial on the charges was such that on its application bail was fixed in the sum of $20,000,000, which defendant did not meet.[22] The defendant was convicted in the Eastern District of Virginia in late fall of 1982; [23] he was convicted in the Southern District of Texas in February 1983.[24] In both instances Wilson had relied on the so-called CIA defense, by which he attempted to show that his acts abroad were authorized and lawful. The charges in those districts, relating to the export of munitions, were entirely different from those in the instant indictment. The charges here are simple but serious, based on an alleged plot to murder witnesses and others connected with the various prosecutions against him.

Third, Wilson knew as early as 1981 that Quintero was a key witness against him in the prosecutions in other District Courts. Before Wilson even returned to the United

**17.** Fed.R.Evid. 401.

**18.** *See* Fed.R.Evid. 104(b).

**19.** *See United States v. Wilson,* 565 F.Supp. 1416, 1421 (S.D.N.Y.1983).

**20.** *Id.*

**21.** *Id.* at 1422.

**22.** *Id.* at 1439.

**23.** *United States v. Wilson,* No. 82–212–A (E.D.Va. judgment entered Dec. 20, 1982). Wilson was sentenced to a total of 15 years imprisonment and commanded to pay a $200,000 fine.

**24.** *United States v. Wilson,* No. H82–139 (S.D. Tex. judgment entered Feb. 24, 1983), *appeal docketed,* No. 83–2125 (5th Cir. Mar. 7, 1983). Wilson was sentenced to a total of 17 years imprisonment and commanded to pay a $145,-000 fine.

States, he had allegedly, through his lawyer, made threats to disclose information that would expose Quintero to mortal danger.[25]

Fourth, Jerome Brower, who was indicted along with Wilson in Washington, D.C., pled guilty in December 1980. The following February, long before the acts alleged to have occurred here took place, Brower was sentenced to twenty months to five years imprisonment, all but four months of which were suspended.[26] Brower was not indicted in the Texas prosecution, but he did testify for the government "as one of the key witnesses against Wilson" in the trial that led to Wilson's conviction for shipping explosives to Libya.[27]

Fifth, central proof in the government's case in this prosecution relates to the period from December 20, 1982, through January 19, 1983.[28] After December 20, Wilson commenced service of the sentence imposed upon him following his conviction in the Virginia trial. Defendant's memorandum accompanying his CIPA submission plays heavily upon tapes indicating Wilson's state of mind on November 2, 1982. But nothing, other than the words of Wilson's lawyers, suggests Wilson's abiding belief in the merits of the "CIA defense."

In light of these facts, it borders on the absurd that detailed testimony about Wilson's activities during his service in the CIA and other intelligence agencies is probative of a lack of motive to seek the deaths of witnesses and prosecutors in his then pending and concluded trials. Proof of Wilson's classified activities, and the minutiae of details of his relationship to others engaged in covert intelligence in different countries of the world, to establish the lack of motive to murder those whose testimony in part was relied upon to obtain his conviction is utterly unrealistic and flies in the face of common sense.[29]

Defendant also argues that classified information concerning Quintero's undercover activities is relevant insofar as "Wilson had no motive to arrange an assassination of Quintero because he could have disclosed information at any time which, the government concedes, would result in Quintero's death." In effect, Wilson argues that if he ever had a purpose to assassinate Quintero he could readily have achieved it by exposing Quintero's intelligence activities, which would have in turn made him the object of assassination attempts by foreign agents. Even if exposing Quintero were lawful,[30] Wilson's failure to do so has no bearing on the issues raised by the indictment in this District.

Finally, Wilson contends that he must be able to show, through the disclosure of classified information, the circumstances surrounding his alleged close and longstanding "foxhole buddy" relationship with Quintero, as well as his relationship to his former wife, Barbara Wilson. The nature of these relationships, Wilson contends, would negate any claim that he ever harbored the intent to solicit the assassinations of Quintero or Barbara Wilson. In the event the defendant decides to testify as a witness in his own behalf, he may, of course, testify to lack of a subjective intent with respect to the crimes charged and to an alleged lack of motive to solicit the murders of witnesses, prosecutors, and others. He may testify to his relationships to Quintero and Barbara Wilson that devel-

---

**25.** *See* Government's Supplemental Motion In Limine *ex rel. Rafael Quintero v. Edwin P. Wilson,* No. 80–200 (D.D.C. Feb. 28, 1983).

**26.** *See* Response of the United States v. Defendant's Supplemental CIPA Submission dated September 26, 1983 at 3.

**27.** *Id.*

**28.** *See* Affidavit of Assistant United States Attorney Eugene Neal Kaplan, *United States v. Wilson,* No. 83–69 (S.D.N.Y. Aug. 26, 1983).

**29.** *United States v. Dobbs,* 506 F.2d 445, 447 (5th Cir.1975); *see United States v. Jordan,* 627 F.2d 683, 686 (5th Cir.1980); *Bromberg v. United States,* 389 F.2d 618 (9th Cir.1968); *United States v. Hickey,* 360 F.2d 127, 140 (7th Cir.), *cert. denied,* 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966).

**30.** *But see* Act of June 23, 1982, Pub.L. No. 97–200, 96 Stat. 122 (to be codified at 50 U.S.C. § 421(a)).

oped during Wilson's and Quintero's assignments while employed in American intelligence. And if those witnesses testify in the government's direct case, he may question them, if he so desires, on the subject of the nature of those relationships. However, the details of their intelligence activities and the assignments these individuals were engaged in may not be referred to; they are not relevant or material to issues arising under the pending indictment.

## IV.

■ Even assuming, contrary to the foregoing, that Wilson's intelligence-related activities and his knowledge of Quintero's relationship to the American intelligence community are relevant on the subject of intent and motivation with respect to the charges in this Court, other compelling reasons counsel their rejection as admissible evidence. Under the Federal Rules of Evidence, this Court has the authority, if not the duty, to weigh the probative value of relevant evidence against "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." [31] Each of these countervailing factors are strongly present in this case.

As our Court of Appeals has noted, the government as well as the defendant has an interest in a trial focused solely on the acts at issue. "[E]vidence having a strong emotional or inflammatory impact ... 'permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what evidence in the case shows actually happened.' " [32] Whatever the defendant's purpose, the introduction of evidence detailing classified activities will have the tendency to focus attention on what cannot be doubted is the controversial character of foreign covert intelligence and counter-intelligence operations. These have been a matter of public notice, editorial expressions of differing views by the news media, public debates and congressional investigations. Appeals to the attitudes of jurors by evidence of the alleged unseemly character of American covert activities would divert their attention from the basic issues in this case—charges centered about alleged plots to kill witnesses connected to prosecutions in the United States District Courts. Wilson is the defendant on trial, not the CIA.[33] The introduction of evidence of the nature referred to in defendant's submission on this motion covers details of extensive activities in many countries throughout the world and its presentation would be time-consuming. But even more important, it would bring before the jury matters utterly irrelevant to the basic charge in this case and serve to divert the jury's attention from those basic issues. Assuming arguendo that evidence of covert activities, here and abroad, has some minimal probative value in this case, such proof should be excluded on the ground that it would unduly delay the trial.

Defendant has stated an intention to introduce evidence of certain character traits, and such proof is allowed by the Rules of Evidence.[34] Those rules, however, do not permit evidence of specific acts to be admitted to prove character traits as part of an affirmative defense.[35] Proof will be ac-

---

**31.** Fed.R.Evid. 403; *see Brink's Inc. v. City of New York*, 539 F.Supp. 1139, 1141 (S.D.N.Y. 1982), *aff'd*, 717 F.2d 700 (2d Cir.1983).

**32.** *United States v. Robinson*, 560 F.2d 507, 514 (2d Cir.1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978).

**33.** *United States v. Sampol*, 636 F.2d 621, 663 n. 31 (D.C.Cir.1980).

**34.** Fed.R.Evid. 404(a)(1). Evidence of general "good character" alone is not admissible. *See United States v. Angelini*, 678 F.2d 380, 381–82

(1st Cir.1982). The evidence must be of a "pertinent character trait." *See id.*

**35.** *See United States v. Davis*, 546 F.2d 583, 592–93 & n. 22 (5th Cir.) (defendant accused of willfully escaping from prison not permitted to introduce "prison records showing ... a favorable work record and ... progress toward rehabilitation" as evidence "to negate the likelihood of wilful escape"), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977).

cepted within the limits of the Rules.[36] Defendant's right to testify in his own behalf, if he so decides, will not be compromised by such compliance.[37] On direct testimony the defendant, if so advised, will be free to testify to the fact of his employment with various agencies in the United States intelligence community and to the fact that he was involved in covert operations. The details of these matters, however, will be excluded for the reasons set forth above.

### V.

■ There is one further item that merits discussion. In July, 1981, after the return of the indictment in Washington, D.C., the defendant executed an agreement to the effect that "in return for the assistance of Raphael Quintero in ... [\* ...\*], Ed Wilson promises never to divulge at any trial or court proceeding any of the past history of Quintero or to divulge the nature of any assistance given by Quintero." The government alleges, and defendant does not contest, that this agreement was signed in the presence of his counsel. No reason has been advanced why this waiver should not be given effect.[38] Defendant's waiver is a further, independent ground for the Court's rulings detailed above.

### VI.

Upon consideration of the defendant's submissions and briefs, the government's

responses, and the arguments of counsel, the Court is persuaded that the details of intelligence and counter-intelligence activities specified in defendant's CIPA submission are without probative weight for the purposes stated by defendant with respect to the charges pending in this District. Further, the Court concludes that even assuming, contrary to the foregoing finding, that such information is of probative value, it is to be excluded because that probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or diverting its attention from the basic issues in the case.

Therefore, except as specified herein, and in the order to be entered herein, the information contained in defendant's CIPA submission is held to be inadmissible upon his trial on charges arising from his alleged efforts to assassinate witnesses, government officials, and others. The Court's protective order shall remain in effect except insofar as it is superseded by further orders of this Court.

So ordered.

---

**36.** *See United States v. Benedetto,* 571 F.2d 1246, 1250 & n. 5 (2d Cir.1978) (Federal Rules of Evidence continue "the general prohibition against direct testimony about specific acts."). As the Supreme Court noted in *Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), the prohibition on testimony to specific acts for the purposes of showing character

> is said to be justified by "overwhelming considerations of practical convenience" in avoiding innumerable collateral issues which, if it were attempted to prove character by direct testimony, would complicate and confuse the trial, distract the minds of jurymen and befog the chief issues in the litigation.

335 U.S. at 478, 69 S.Ct. at 219 (citations omitted). Under Fed.R.Evid. 405(b), specific acts may be used to prove character only when character is an "essential element of a charge, claim, or defense." No such character trait is present here. *See United States v. Pantone,* 609 F.2d

675, 681 (3d Cir.1979); *Christy v. United States,* 68 F.R.D. 375, 378 (N.D.Tex.1975); McCormick on Evidence § 187 (2d ed. 1972).

**37.** As our Court of Appeals noted in construing a defendant's right to testify in his own defense:

> A defendant's right to present a full defense, including the right to testify in his own behalf, is not without limits. In responding to the charges against him, an accused must comply with the established rules of procedure and evidence, as must the prosecution, in order to insure a fair trial.... A criminal defendant's right to present a full defense and to receive a fair trial does not entitle him to place before the jury evidence normally inadmissible.

*United States v. Bifield,* 702 F.2d 342, 350 (2d Cir.1983).

**38.** *See Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).