**UNITED STATES of America, Plaintiff,**

v.

**Reinaldo Juan LOPEZ–LIMA, Defendant.**

**No. 69–0096–CR.**

United States District Court, S.D. Florida, Miami Division.

June 7, 1990.

William Xanttopoulos, Asst. U.S. Atty., Miami, Fla., for plaintiff.

Jeffrey D. Feldman, Fine, Jacobson, Schwartz Nash Block & England, Miami, Fla., for defendant.

## MEMORANDUM ORDER

RYSKAMP, District Judge.

### I. INTRODUCTION

THIS MATTER is before the court pursuant to section 6(a) of the Classified Information Procedures Act ("CIPA"), for a determination "concerning the use, relevance, or admissibility of classified information" that defendant Reinaldo Juan Lopez–Lima seeks to use at trial. 18 U.S.C. app. § 6(a) (1988). The court conducted a hearing as provided by CIPA on Friday, May 25, 1990.

For the reasons discussed below, the court holds that Lopez–Lima's version of events, if believed, constitutes a legally cognizable defense to the criminal charges against him and serves to negate his wrongful intent, a requisite element of the offense charged. Thus, the classified information that Lopez–Lima seeks to introduce to substantiate his version of events is relevant to his defense. The court also holds that this classified information will be admitted over government objections that it is prejudicial and misleading or violative of the hearsay rule. Accordingly, Lopez–Lima shall be permitted to testify to his version of the facts and to present competent evidence, including classified information, in support of his defense.

A specific ruling as to the items of classified information that Lopez–Lima seeks to introduce is set forth in Part V of this order. The court makes no ruling as to the admissibility of now unclassified information, such as information about Lopez–Lima's relationship with the CIA.

### II. THE INDICTMENT AND THE DEFENSE

The indictment against Reinaldo Juan Lopez–Lima charges him with aircraft piracy in violation of Title 49, United States Code App., Section 1472(i). Specifically, the indictment charges that on or about February 18, 1964, Lopez–Lima "did unlawfully commit aircraft piracy in that [he and codefendant Enrique Castillo–Hernandez] did seize and exercise control by threat of force and violence, and with wrongful intent, of an aircraft ... that is, the defendant did force Richard L. Wright at gunpoint to fly from Monroe County, Florida, to the Republic of Cuba."

The indictment against Lopez–Lima and Castillo–Hernandez was returned February 17, 1969. Until 1980, both defendants remained fugitives, as they were jailed in Cuba for illegal entry into that country. Castillo–Hernandez returned to the United States via the Mariel boatlift of 1980, when he was tried on the pending charge. His 1980 trial ended in a mistrial; the jury could not agree on a verdict. Castillo–Hernandez later pled guilty and was given a suspended sentence of two years probation.

Lopez–Lima returned to the United States in 1987. In 1989, the U.S. State Department approached him as a possible source of information about Cuba, at which point the outstanding indictment against him was discovered. This prosecution then ensued.

Lopez–Lima's defense to the air piracy charge is that the hijacking was authorized by the Central Intelligence Agency ("CIA"), as part of its activities to destabilize the communist regime of Fidel Castro. According to Lopez–Lima, he and Castillo–Hernandez were to pose as defectors from the Cuban exile community who intended to reenter Cuba and support Castro. Amended Notice of Defendant's Intent to Disclose Classified Information, filed October 11, 1989. Once inside Cuba, the codefendants were to assist anti-Castro activists. Lopez–Lima claims that this CIA operation was designed to look like a hijacking, so that Cuban authorities would not suspect CIA involvement.

For purposes of this order, the court considers only the government's motion to exclude classified information. The court does not consider exclusion of evidence regarding Lopez–Lima's parole by the Immigration and Naturalization Service ("INS") or his incarceration in a Cuban prison, to which the government referred in its motion. Nonetheless, the government will be permitted to renew its motion regarding that evidence at a later time.

## III. THE CLASSIFIED INFORMATION PROCEDURES ACT

The Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. §§ 1–16, was enacted in 1980 as a procedural means to handle the use of classified material in criminal cases. *United States v. Collins*, 720 F.2d 1195, 1196–97 (11th Cir.1983). CIPA section 6 provides for the court to conduct a hearing to determine the use, relevancy, and admissibility of classified information that the defendant seeks to disclose in his defense.

▪ Under CIPA, the court must use existing standards for determining relevance and admissibility. *United States v. Anderson*, 872 F.2d 1508, 1514 (11th Cir. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 566, 107 L.Ed.2d 560 (1989). The terms of the statute indicate that evidence may be excluded under F.R.E. 401 as irrelevant.[1] Evidence may also be excluded under F.R.E. 403 as prejudicial, misleading, and confusing.[2] *Anderson*, 872 F.2d at 1519 (affirming exclusion of details of prior covert operations as government lacked real authority to authorize offense charged); *United States v. Wilson*, 586 F.Supp. 1011, 1016 (S.D.N.Y.1983) (excluding evidence of prior covert activities as not probative of lack of motive for murder), *aff'd,* 750 F.2d 7 (2d Cir.1984). The fact that the information in question is classified should not be considered when determining its admissibility. *United States v. Juan*, 776 F.2d 256, 258 (11th Cir.1985); *United States v. Collins*, 720 F.2d 1195, 1199 (11th Cir.1983).[3] Lopez–Lima bears the burden of showing the admissibility of his section 5 information. *United States v. Miller*, 874 F.2d 1255, 1277 (9th Cir.1989). When ruling on

the admissibility of classified information, the court must set forth in writing the basis for its determination as to each item of classified information at issue. CIPA, 18 U.S.C.App. § 6(a).

If the court determines that classified information is admissible under section 6(a), the government may move for permission to substitute a summary or admission of relevant facts under section 6(c)(1). The court must grant a section 6(c)(1) motion, if it finds that the statement or summary will provide the defendant with "substantially the same ability to make his defense as would disclosure of the specific classified information." *Id.,* § 6(c)(1). If a section 6(c) motion is denied, the government can require that the defendant not disclose the classified information. *Id.,* § 6(e)(1). Then, the court must dismiss the indictment, unless the government convinces the court that justice would not be served by the dismissal. *Id.,* § 6(e)(2).

▪ District court rulings on the admissibility of classified information may be reviewed by interlocutory appeal on an expedited basis. *Id.,* § 7; *United States v. Collins*, 720 F.2d 1195, 1197 (11th Cir. 1983).

## IV. ANALYSIS

The issue presented in the section 6 hearing is whether Lopez–Lima has a legally cognizable defense based on classified information, so as to make that information relevant at trial. Lopez–Lima has filed six notices of lassified information that he intends to disclose, regarding his involvement with the CIA and the purported CIA sanctioning of the 1964 flight to Cuba.[4]

---

1. Rule 401: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

2. Rule 403: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

3. *But see United States v. Smith*, 780 F.2d 1102, 1106–10 (4th Cir.1985) (en banc) (common law privileges applicable when determining admissibility of evidence under CIPA, such as government privilege to protect identity of informant). *Smith* is discussed *infra* at note 7.

4. These six notices, submitted pursuant to CIPA § 5 and F.R.Crim.P. 12.3, are included in Defendant's Response to Government's Motion to Exclude Evidence of Purported CIA Involvement and Evidence as to Defendant's INS Parole and His Incarceration in Cuba, Exhibit A. After the § 6 hearing, Lopez–Lima filed another notice

Lopez–Lima seeks to use the classified information included in the notices in two ways: (1) as an affirmative defense to show his reliance on the real authority of the CIA to sanction the hijacking; and (2) to rebut the government's proof on the intent element of the air piracy offense. *See United States v. Smith,* 592 F.Supp. 424, 429 n. 3 (E.D. Va.1984) (distinguishing between an affirmative defense and lack of intent), *vacated on other grounds,* 780 F.2d 1102 (4th Cir.1985); Tamanaha, *A Critical Review of the Classified Information Procedures Act,* 13 Am.J.Crim.L. 277, 280 n. 15 (1986) (same). The government challenges the use of this classified information on grounds of relevancy and admissibility. The court considers each basis for relevancy individually, although the same classified information would be used to prove either basis.

### A. The Real Authority Defense.

■ The Eleventh Circuit expressly has rejected a defense based on a merely apparent government authority. *United States v. Anderson,* 872 F.2d 1508, 1515–16 (11th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 566, 107 L.Ed.2d 560 (1989); *United States v. Rosenthal,* 793 F.2d 1214, 1233–36 (11th Cir.1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987). Nonetheless, a defendant may assert as an affirmative defense that his criminal act was undertaken in reasonable reliance on real government authority. *Anderson,* 872 F.2d at 1515; *Rosenthal,* 793 F.2d at 1235–36.[5] If Lopez–Lima's case falls within the confines of a real authority affirmative defense, the classified information he seeks to introduce would be relevant at trial.

■ The confines of a real authority defense are not well defined. As the courts in *Rosenthal* and *Anderson* rejected mere apparent authority defenses, the Eleventh Circuit has not articulated the parameters of a viable real authority defense. This court holds that to establish a public authority affirmative defense, the defense must show that the governmental entity involved had the real authority to sanction conduct that would violate the laws under which the defendant is charged; and that the defendant acted in reasonable reliance on an actual U.S. government agent. The court now considers whether the version of events put forth by Lopez–Lima constitutes such a public authority defense.

■ 1. *CIA Authority in 1964.* In requiring a showing of real authority, the Eleventh Circuit in *Anderson* and *Rosenthal* relied on an executive order signed in 1981 to determine that the implicated governmental entities lacked the real authority to sanction the charged activities. Executive Order 12,333, signed by President Reagan on Dec. 4, 1981, outlines U.S. intelligence activities but specifically provides that "[n]othing in this Order shall be construed to authorize any activity in violation of the Constitution or statutes of the United States." Exec. Order No. 12,333, Part 2.8, 46 Fed.Reg. 59,941 (1981), *reprinted in* 50 U.S.C. § 401 at 49 (1982); *see Anderson,* 872 F.2d at 1516 (CIA lacked actual authority to approve exceptions to the laws regulating high explosives and other munitions); *Rosenthal,* 793 F.2d at 1236 (neither CIA nor other intelligence agencies has actual authority to authorize conduct that would violate 'the Constitution or statutes of the United States,' including federal narcotics laws).[6]

---

regarding purported CIA involvement in his return to the United States. The court makes no ruling on the relevancy of classified information that may be implicated by this last notice, as the defense has not shown how this information fits within either basis of relevancy.

**5.** The real authority defense recognized in the Eleventh Circuit presumably allows for a defense based on the traditional limited exceptions to the mistake of law doctrine. As the court determines that the CIA had the real authority

to sanction a hijacking in 1964, Lopez–Lima made no mistake of law. *See Rosenthal,* 793 F.2d at 1235.

**6.** The government argues, incorrectly, that the Eleventh Circuit precedent in *Anderson* and *Rosenthal* was not based on Executive Order 12,333. The government also argues, correctly, that the court in *Rosenthal* relied as well on *United States v. Duggan,* 743 F.2d 59, 83–84 (2d Cir.1984), in which the Second Circuit did not cite Executive Order 12,333 to reject the appar-

In 1964, the time of the offense with which Lopez–Lima is charged, Executive Order 12,333 did not exist. Thus, the CIA was not precluded explicitly from authorizing Lopez–Lima and his codefendant to hijack a plane to Cuba, even if that act were illegal according to U.S. statutes. That the Eleventh Circuit relied on the executive order in *Anderson* and *Rosenthal* to reject the apparent authority defense presents a number of questions for the court.

The first question is whether Executive Order 12,333 changed existing practice or merely codified practice that existed in 1981 and before. The answer to this question is revealed unequivocally in the public record, in the final report of what is popularly known as the Church Committee. Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities, S. Rept. No. 94–755, 94th Congress, 2nd Session, Book I (1976) [hereinafter "Church Committee Report"]. The Church Committee documented numerous activities undertaken by the intelligence community that violated declared policy and law, noting that "these abuses cannot be regarded as aberrations." *Id.* at 4. Clearly, Executive Order No. 12,333 was a corrective measure designed to stop intelligence agencies from engaging in covert activities that violated U.S. law.

The second question concerning Executive Order No. 12,333 is whether in its absence the CIA had the authority to authorize illegal activity. The answer to this question requires consideration of the laws and directives that created the CIA and cloaked it with the authority to engage in covert activities.

The CIA was established under the National Security Act of 1947. National Security Act of 1947, ch. 343, 61 Stat. 495 (1947) (codified as amended at 50 U.S.C. §§ 401–405 (1982)). Under the 1947 act, Congress empowered the agency to perform various intelligence functions, such as advising the National Security Counsel and correlating intelligence related to national security. 50 U.S.C. § 403(d)(1), (3). Significantly, Congress also granted the CIA a broad, nonspecific power "to perform such other functions and duties related to intelligence affecting the national security as the National Security Council may from time to time direct." *Id.* § 403(d)(5).

From the broad, nonspecific grant of power in section 403(d)(5), the National Security Council, with presidential approval, issued various directives that eventually provided the CIA with the license to exercise vast power. In 1948, Directive 10–2 formally authorized the CIA to conduct covert operations, which were defined as those "which are so planned and executed that any US [sic] Government responsibility for them is not evident to unauthorized persons and that if uncovered the US [sic] Government can plausibly disclaim any responsibility for them." *See* National Security Council Directive 10–2, § 5, June 18, 1948 (included in Defendant's Response to Government's Motion to Exclude Evidence of Purported CIA Involvement and Evidence as to Defendant's INS Parole and His Incarceration in Cuba [hereinafter "Defendant's Response"], Exhibit C). These covert operations were specified to include propaganda campaigns and economic subversion of hostile states.

In 1955, the National Security Council expanded CIA authority to conduct covert operations, allowing such operations necessary to meet the goals and objectives of the

ent authority defense. *See Rosenthal,* 793 F.2d at 1235.

Notwithstanding the *Rosenthal* court's reliance on *Duggan,* this court interprets that reliance as based on the distinction between the real and apparent authority defenses and not on the factual conclusion in *Duggan* that a real authority defense was not shown. Factually, this case is distinguishable from *Duggan.* The offenses in *Duggan* occurred in 1981, only months before Executive Order 12,333 was signed. *Duggan,* 743 F.2d at 65. Significantly,

one defendant in *Duggan* "acknowledged, on cross-examination, that he was aware that CIA operatives had been sought on criminal charges, despite their CIA background, for engaging in the same conduct [with which he was charged]" *Id.* at 84. In contrast, the crime charged in this case occurred in 1964, long before the executive order was signed. The government has provided no example of government assets prosecuted for engaging in activities analogous to those charged here during the relevant time period.

agency. *See* National Security Council Directive 5412–1, § 6, March 12, 1955 (included in Defendant's Response, Exhibit D). The Council retained the concept of plausible deniability but broadened the catalogue of listed covert activities to include:

> any covert activities related to: propaganda, political action; economic warfare; preventative direct action, including sabotage, anti-sabotage, demolition; escape and evasion and evacuation measures; subversion against hostile states or groups including assistance to underground resistance movements, guerrillas and refugee liberation groups; support of indigenous and anti-communist elements in threatened countries of the free world; deception plans and operations; and all activities compatible with this directive necessary to accomplish the foregoing.

Although this directive was amended, its definition of covert activities did not change. *See* National Security Council Directive 5412–2, § 6, Dec. 28, 1955 (included in Defendant's Response, Exhibit D).

The catalogue of covert activities included in the 5412 Directives was that which the CIA was empowered to pursue in 1964, the year of the offense with which Lopez–Lima is charged. Until Executive Order 12,333 was signed in 1981, the CIA was under no limitation that its activities could not violate U.S. law. Significantly, nothing required the CIA to clear its activities with the Department of Justice, even though the directives of the National Security Council required clearance with the Departments of State and Defense. *See* National Security Council Directive 10–2, § 3(d)(1), June 18, 1948 (included in Defendant's Response, Exhibit C); National Security Council Directive 5412–1, § 4(a), March 12, 1955; National Security Council Directive 5412–2, § 4(a), Dec. 28, 1955 (both included in Defendant's Response, Exhibit D).

Not only was there no requirement that the CIA comply with the law in 1964, according to the Church Committee report the agency routinely violated the law during the time period of the offense in question. Congressional oversight of intelligence activities during this time period was extremely limited. Church Committee Report, Book I, at 447. This situation began to change only in 1974, when Congress passed the Hughes–Ryan Amendment, which established presidential accountability for covert activities and statutory reporting requirements. Pub.L. No. 87–195, Pt. III, § 662, as added Pub.L. No. 93–559, § 32, 88 Stat. 1804 (1974) (codified as amended at 22 U.S.C. § 2422 (1988)). Thereafter, the Senate empaneled the Church Committee, which issued its final report in 1976. Following that report, a number of executive orders were issued that limited covert operations, including Executive Order No. 12,333.

Yet, the situation was far different in 1964. At that time, the CIA operated with broad authority, emanating from successive National Security Council directives issued pursuant to a vague congressional grant of authority in section 403(d)(5). Accordingly, the court holds that in 1964 the CIA had the real authority to authorize a hijacking to Cuba, as one of its "deception plans and operations." The court does not accept the government's argument that even if the CIA used its authority to authorize the illegal activity with which Lopez–Lima is charged, the use of that authority would be not real but illegitimate. According to this argument, if the CIA acted in a vacuum of authority to authorize illegal covert activities, it cannot be said to have possessed the real authority to authorize those activities. Yet, the Church Committee did not so conclude. If the court were to accept the government's argument, it would be impossible for a defendant to establish a real authority defense. Even if the CIA's authority to authorize illegal covert activities in 1964 was not specifically provided in law, it was exercised as a very real authority.

*2. Reasonable Reliance on a Government Agent.* Although the CIA as a entity had the real authority to authorize an illegal hijacking in 1964, Lopez–Lima still must show that he reasonably relied on the authorization of government agents acting in their individual capacities.

According to CIA records, the individuals named in Lopez–Lima's notices as having sanctioned the hijacking were actual CIA assets at the time. Thus, the court does not confront the situation presented in *United States v. Smith,* in which the CIA had no record of the two men who the defendant claimed authorized him to divulge classified information, an act that led to his prosecution under the Espionage Act. *See United States v. Smith,* 592 F.Supp. 424, 430 and n. 5 (E.D.Va.1984), *vacated on other grounds,* 780 F.2d 1102 (4th Cir.1985) (en banc).[7]

■ Although the government has acknowledged that the individuals named in Lopez–Lima's notices were CIA assets at the time of the hijacking, it makes a number of arguments against permitting a public authority defense based on that fact. First, the government argues that ven if the named individuals were CIA assets, Lopez–Lima has failed to establish a valid real authority defense because the CIA has no record that these individuals authorized the hijacking. Thus, the government argues that Lopez–Lima has no competent evidence that the hijacking was authorized. The court determines that even if no such record exists, this does not conclusively establish that the named individuals did not authorize the hijacking so as to justify Lo-

---

7. The Fourth Circuit in *Smith* did not disagree with the district court determination that certain classified information was relevant, as it tended to make the defendant's account of events more probable. *United States v. Smith,* 780 F.2d 1102, 1106 (4th Cir.1985) (en banc). Notwithstanding, the appellate court concluded in a 6–5 en banc decision that the district court applied an incorrect legal standard when determining whether classified information would be introduced. *Id.* at 1104. The appellate court ruled that the defendant's right to prepare his defense had to be balanced against the public interest in preventing the disclosure of classified information, as under *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), which recognized a government privilege to protect informants. *Smith,* 780 F.2d at 1105. The Fourth Circuit declined to establish a "rigid rule" for the proper balance, stating that it would vary from case to case depending on the crime charged, how essential the information was to the defense, and whether the information was merely cumulative or corroborative. *Id.* at 1110. Notwithstanding, the Fourth Circuit specifically held that the standard of admissibility for the classified information "is at the least more restrictive than the ordinary rules of *relevancy* would indicate." *Id.* (emphasis in original).

The en banc decision in *Smith* and a subsequent Fourth Circuit case following the same approach, *United States v. Zettl,* 835 F.2d 1059 (4th Cir.1987), have been criticized for ignoring the fact that Congress specifically rejected an administration bill that suggested the balancing approach of *Roviaro.* Comment, *Government Secrets, Fair Trials, and the Classified Information Procedures Act,* 98 Yale L.J. 427, 441 (1988). Although other circuits have considered the *Smith* balancing approach, none appears to have adopted it for purposes of determining admissibility. *See United States v. Rewald,* 889 F.2d 836, 847–48 (9th Cir.1989) (as government did not argue that national security interests could "trump" defendant's right of access to relevant classified information, confining itself to review of relevancy and admissibility); *United States v. Yunis,* 867 F.2d 617, 625 (D.C.Cir. 1989) (as relevance of classified information only theoretical, did not decide whether to balance government interest in secrecy with defendant's interest in disclosure); *United States v. Sarkissian,* 841 F.2d 959, 965 (9th Cir.1988) ("[o]n issues of discovery, the court can engage in balancing").

The Eleventh Circuit has not discussed the balancing approach used by the Fourth Circuit, although it cited the Fourth Circuit decision in *Smith* for the proposition that "Congress did not intend to alter the existing standards for determining relevancy and admissibility of evidence." *United States v. Anderson,* 872 F.2d 1508, 1514 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 566, 107 L.Ed.2d 560 (1989); *see also United States v. Rosenthal,* 793 F.2d 1214, 1236 (11th Cir.1986) (distinguishing district court opinion in *Smith* as involving mistake-of-fact and not mistake-of-law), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987).

Prior Eleventh Circuit decisions indicate that, when making relevancy and admissibility determinations under § 6(c), a district court must apply the general relevancy standard of F.R.E. 401. In *United States v. Juan,* 776 F.2d 256, 258 (11th Cir.1985), the court stated that when "appraising materiality, the court is not to consider the classified nature of the evidence." *Id.* (citing *United States v. Collins,* 720 F.2d 1195, 1199 (11th Cir.1983)). The Eleventh Circuit in *Juan* then stated that "[h]owever, in passing upon a motion under Section 6(c) [for a statement or summary] the trial judge should bear in mind that the proffered defense evidence does involve national security." *Juan,* 776 F.2d at 258. Thus, once the court determines that the classified information Lopez–Lima seeks is relevant and necessary to his defense under § 6(c), the government must determine what course it wishes to pursue to protect the classified information that has been ruled relevant and admissible.

pez–Lima to rely on their representations. *See Smith*, 592 F.Supp. at 430 n. 5 (although no CIA record of persons named by defendant as authorizing disclosure of classified information, that did not "conclusively establish that they do not exist or were not CIA agents").

■ Second, the government argues that Lopez–Lima fails to establish a real authority defense, because the instructions he claims to have received from the CIA were so broad as to exceed the allowable scope of that defense. The government points to Lopez–Lima's statement that CIA assets told the codefendants to "go for it" and cites *United States v. Berg*, 643 F.Supp. 1472 (E.D.N.Y.1986), for the proposition that such blanket authority cannot constitute a real authority defense.

The court determines that the government's reliance on *Berg* is misplaced. In *Berg*, the court rejected a public authority defense to charges of illegally trafficking in firearms, when the defendant claimed that intelligence agents told him to "do whatever he had to" in order to obtain certain tanks. *Id.* at 1476. The court concluded that "[t]he proposition that a defendant may commit a criminal act without prior notice to any Government official on the basis of a supposed *carte blanche* authorization or a license to do everything but kill is without precedent and stretches any concept of good faith reliance beyond recognition." *Id.* at 1480.

The blanket authority claimed in *Berg* is not claimed in this case. While Lopez–Lima may have stated that he was told to "go for it," defense counsel also has represented that Lopez–Lima was told to do the very act for which he was charged. Transcript of Hearing May 25, 1990, at 104. Even the court in *Berg* stated that its result might have been different if intelligence agents specifically ordered the defendant to export arms to Poland, the of-

fense for which he was charged, or if he had informed intelligence officials of his intentions beforehand. *Berg*, 643 F.Supp. at 1481.

■ Third, the government argues that Lopez–Lima fails to establish a real authority defense because the named individuals lacked the authority or status within the CIA to authorize the hijacking. According to the government, both individuals were low level CIA assets involved solely in maritime activities and would not have sanctioned the hijacking of an aircraft.

■ If Lopez–Lima were mistaken as to who within the CIA hierarchy had the status to sanction such a mission, this mistake would not defeat his real authority defense even if viewed as a mistake of law. *United States v. Smith*, 592 F.Supp. 424, 432 n. 10 (E.D.Va.1984), *vacated on other grounds*, 780 F.2d 1102 (4th Cir.1985) (en banc). An exception to the mistake of law doctrine exists when the mistake arises not from ignorance of the law but from "ignorance 'of an independently determined legal status or condition that is one of the operative facts of the crime.'" *Smith*, 592 F.Supp. at 433 n. 10 (quoting *United States v. Fierros*, 692 F.2d 1291, 1294 (9th Cir. 1982), *cert. denied*, 462 U.S. 1120, 103 S.Ct. 3090, 77 L.Ed.2d 1350 (1983)). Such "a mistake as to an independently defined legal status is, in reality, a mistake of fact." *Smith*, 592 F.Supp. at 433 n. 10 (citing *Fierros*, 692 F.2d at 1294). If it occurred, Lopez–Lima's mistake as to the status element of his public authority defense, *i.e.*, whether the person on whose authority he purportedly relied was a government official of a particular type, would be a valid mistake of fact. *Smith*, 592 F.Supp. at 431 n. 7, 433 n. 11 (citing Note, *Reliance on Apparent Authority as a Defense to Criminal Prosecution*, 77 Colum.L.Rev. 775, 789 (1977)).[8]

---

8. The distinction drawn by the district court in *Smith* as to the status and authorization components of a public authority defense is a useful one. As opposed to the status element described in the text, the authorization component "refers to the defendant's belief as to the authority possessed by that type of individual." The

authorization component is a mistake of law and but a restatement of the apparent authority defense rejected in this circuit. *United States v. Anderson*, 872 F.2d 1508, 1515–16 (11th Cir. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 566, 107 L.Ed.2d 560 (1989); *United States v. Rosenthal*, 793 F.2d 1214, 1233–36 (11th Cir.1985),

Lopez–Lima must be allowed to introduce evidence to establish whether he reasonably relied on the sanction of actual government assets. While the named assets might "have no authority themselves [to sanction the hijacking of an airplane], they undoubtedly have authority to communicate decisions made by those in the CIA hierarchy who have authority." *Smith*, 592 F.Supp. at 432 n. 10. Thus, "[a] rational juror could conclude that [Lopez–Lima] relied on [the named assets'] authority to communicate top-level decisions concerning [anti-Castro missions]." *Id; see also United States v. Clegg*, 846 F.2d 1221, 1224 (9th Cir.1988) (permitting defendant to present evidence that he relied on "solicitation, encouragement, and assistance" of U.S. military personnel as authorization to supply arms to Afghan rebels in violation of U.S. law); *United States v. Barker*, 546 F.2d 940, 957 (D.C.Cir.1976) (Merhige, J., concurring) (jury may find that Watergate burglars, "acting as reasonable men, relied upon" presidential assistant's express or implied position that break-in legal, as conveyed by "an executive official in a go-between capacity"). Indeed, few people are likely to know the internal workings of the CIA, as that information is doubtless a closely guarded secret. *Smith*, 592 F.Supp. at 433 n. 10.

### B. *Negation of Requisite Criminal Intent.*

Beyond establishment of a public authority affirmative defense, the classified information in Lopez–Lima's notices is relevant to negate the element of wrongful intent in the hijacking offense charged. The "wrongful intent" in the hijacking statute is a general, not a specific, intent. *United States v. Casteneda–Reyes*, 703 F.2d 522, 525 (11th Cir.1983), *cert. denied*, 464 U.S. 856, 104 S.Ct. 174, 78 L.Ed.2d 157 (1983). It "is no more than the general criminal intent present when one seizes or exercises control of an aircraft without having the legal authority to do so." *Id.* (quoting *United States v. Bohle*, 445 F.2d 54, 60 (7th Cir.1971)).

*cert. denied*, 430 U.S. 919, 107 S.Ct. 1377, 94

The wrongful intent required in section 1472(i) is not linked inextricably to the threat or use of violence to seize or exercise control over an aircraft, as the government argues. Indeed, the cases cited by the government either do not consider the element of wrongful intent or consider it as an element separate and distinct from the element involving force. *See United States v. Pablo–Lugones*, 725 F.2d 624, 626 (11th Cir.1984), *cert. denied*, 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984); *United States v. Dixon*, 592 F.2d 329 (6th Cir.1979), *cert. denied*, 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979).

In *Pablo–Lugones*, the Eleventh Circuit rejected the defendant's claim that the government failed to prove the "force and violence" element of attempted aircraft piracy, because he did not intend to actually use the gasoline bomb he brought on board but intended only to display it to intimidate the crew. As the court stated, "a display of a dangerous weapon is a sufficient use of force and violence for the purpose of a hijacking...." *Pablo–Lugones*, 725 F.2d at 626. The court in *Pablo-Lugones* never considered the element of wrongful intent; it considered whether a *threat* of force was sufficient to establish the element of *use* of force.

Neither does *Dixon* support the government's position. In *Dixon*, the Sixth Circuit enumerated four elements needed to prove an air piracy charge under section 1472(i): "(1) Seizure or exercise of control of an aircraft; (2) by force, violence, or intimidation, or the threat thereof; (3) with wrongful intent; (4) while in the aircraft jurisdiction of the United States." *Dixon*, 592 F.2d at 339–40. Obviously, the court in *Dixon* treated the elements of force and wrongful intent as entirely separate elements of a air piracy charge.

As stated by the Eleventh Circuit in *Casteneda–Reyes*, a defendant must wrongfully intend to illegally seize control of an aircraft in order to possess the requisite intent to violate section 1472(i). If a defendant reasonably believed that his act was not illegal because he was acting on behalf

L.Ed.2d 692 (1987).

of the government, he would not possess the requisite wrongful intent. This is what Lopez–Lima argues: even if he were mistaken in believing that the CIA authorized the hijacking, that belief, if reasonable, would negate his wrongful intent. This defense, essentially one of mistake-of-fact, has been recognized by the Eleventh Circuit. *United States v. Anderson,* 872 F.2d 1508, 1516 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 566, 107 L.Ed.2d 560 (1989); *United States v. Juan,* 776 F.2d 256, 258 (11th Cir.1985); *see also United States v. Rosenthal,* 793 F.2d 1214, 1236 (11th Cir.1986), *cert. denied,* 430 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987).[9]

In *Juan,* the Eleventh Circuit ruled that the defendant could show his prior relationship with the government in order to show the basis of his allegedly innocent intent. *Juan,* 776 F.2d at 259. The court determined that the evidence was relevant, even if it ultimately did not persuade the jury that the defendant was innocent. *Juan,* 776 F.2d at 258. In *Anderson,* the court did not order the disclosure of classified information, because the defendant was allowed to produce unclassified evidence of his prior covert activities, his security clearance, the fact that he was trained to conceal agency contacts, and the fact that the act resulting in charges against him resembled his earlier covert activities. *Anderson,* 872 F.2d at 1518.

### V. RULINGS UNDER CIPA SECTION 6(a)

For the reasons articulated, the court concludes that Lopez–Lima's version of events, if credited by a jury, establishes an affirmative defense to the aircraft piracy charge against him and negates the wrongful intent necessary to secure a conviction on that charge. The classified information Lopez–Lima seeks to introduce clearly is relevant to his defense, as it would tend to show that the CIA sanctioned the hijacking or that he reasonably believed that it did. Of course, while the classified information is relevant, it may not prove persuasive before a jury. *United States v. Juan,* 776 F.2d 256, 258 (11th Cir.1985); *United States v. Smith,* 592 F.Supp. 424, 444 (E.D. Va.1984), *vacated on other grounds,* 780 F.2d 1102 (4th Cir.1985). Notwithstanding, Lopez–Lima is entitled to have a jury consider the theories and evidence that he marshals in his defense.

The court also determines that Lopez–Lima is not precluded by F.R.E. 403 from introducing this classified information. In both cases relied on by the government, classified information was excluded on this ground because it was not connected to the particular offense charged. *United States v. Anderson,* 872 F.2d 1508, 1519 (11th Cir.1989) (affirming exclusion of details of prior covert operations as government lacked real authority to authorize offense charged), *cert. denied,* —— U.S. ——, 110 S.Ct. 566, 107 L.Ed.2d 560 (1989); *United States v. Wilson,* 586 F.Supp. 1011, 1016 (S.D.N.Y.1983) (excluding evidence of prior covert activities as not probative of lack of motive for murder), *aff'd,* 750 F.2d 7 (2d Cir.1984). Finally, the court determines that the classified information also withstands any objections regarding its admissibility.[10] Accordingly, it is hereby:

---

**9.** The decision in *Rosenthal* did not involve a mistake-of-fact defense, and thus the Eleventh Circuit distinguished the district court decision in *Smith. Rosenthal,* 793 F.2d at 1236. In contrast to the situation presented in *Smith,* the court in *Rosenthal* determined that the defense "was based on an erroneous legal conclusion that the C.I.A. could violate federal drug laws" and thus constituted a mistake of law or a defense based on merely apparent authority. *Id.* Agreeing with the district court that a CIA defense was not viable, the Eleventh Circuit alluded to Executive Order 12,333, stating that "the government contends, and it is law, that the C.I.A. is prohibited from violating the statutes of the United States and hence, a C.I.A. agent could

not lawfully authorize a violation of federal drug laws." *Id.*

**10.** The government argued that the classified information is inadmissible hearsay; however, it eventually conceded that evidence of Lopez–Lima's subjective intent at the time of the offense would not be hearsay, because it would not be offered for the truth of the matter asserted but to show his state of mind. F.R.E. 801(c); *United States v. Rubin,* 591 F.2d 278, 283 (5th Cir.1979), *cert. denied,* 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979); *United States v. Smith,* 592 F.Supp. 424, 434 n. 13 (E.D.Va.1984), *vacated on other grounds,* 780 F.2d 1102 (4th

ORDERED and ADJUDGED that classified information regarding the individuals identified by Lopez–Lima as CIA assets who sanctioned the hijacking is relevant and admissible. Such information includes that listed in Lopez–Lima's various notices, involving what, if any, relationship these individuals had with the CIA; the duration of the relationship; the extent of the individuals' activities and status within the CIA, including whether these individuals recruited other CIA assets; and contacts between those individuals and the defendants. Such information also includes the documents listed in the Supplemental Notice of Defendant's Intent to Disclose Classified Information, filed under seal May 18, 1990.

ORDERED and ADJUDGED that Lopez–Lima's motion for disclosure of classified rebuttal evidence, filed May 23, 1990, is GRANTED. Pursuant to CIPA section 6(f), the government shall disclose to defendant classified information that it intends to use to rebut the classified information being offered by the defense.

DONE and ORDERED.

Cir.1985). The trial testimony of the codefendant, now deceased, is admissible under F.R.E. 804(b)(1).